IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

LARISSA WHITE, an individual,   )
                                ) Case No.
            Plaintiff,           ) 6:18-cv-00550-MK
                                )
    v.                           )
                                )
CITY OF TURNER POLICE CHIEF DON  )
TAYLOR; by and through the CITY OF )
TURNER POLICE DEPARTMENT, a      )
political subdivision of TURNER, )
OREGON,                          )
                                )
            Defendants.          )

VIDEO DEPOSITION OF DONALD J. TAYLOR

Taken in behalf of the Plaintiff

March 7, 2019

\* \* \*

EXHIBIT C
6:18-cv-00550-JR
Page 1 of 12

1          MR. THENELL:  Yes.  In anything.  In either of
2     our cases, okay, Counsel?
3          MR. CAMPBELL:  Thank you.
4          MR. THENELL:  Can we go off the record for a
5     sec.
6               (Recess was taken 1:08 to 1:12.)
7               (EXHIBIT marked:  Exhibit 1.)
8  BY MR. THENELL:
9  Q.  All right.  Chief Taylor, can you identify this
10     document for me, please?
11         MR. CAMPBELL:  Exhibit 1.
12         MR. THENELL:  Exhibit 1.
13         MR. CAMPBELL:  Yeah, absolutely.
14         THE WITNESS:  It was written by Detective
15     Sergeant Steve Smith.
16  BY MR. THENELL:
17  Q.  Okay.  So when did you -- when did you determine --
18     or when did you start an investigation involving
19     Lacey White?
20         MR. CAMPBELL:  Object to the form.  You can
21     answer.
22         THE WITNESS:  I didn't investigate.
23  BY MR. THENELL:
24  Q.  Okay.  What -- when did you ask Salem to
25     investigate?

1  A. Early March.
2  Q. And why did you ask Salem to investigate?
3  A. Because of the possible discrepancy in time.
4  Q. Okay. Could you tell me more details of that
5     possible discrepancy in time?
6  A. There was a call in pending from the evening before
7     that I thought she should have been on for. Had
8     some conversation with dispatch and found out how
9     many hours she'd worked that day.
10 Q. Okay. And what did you determine?
11 A. That it needed to be investigated by an outside
12    agency.
13 Q. So I want to just -- I want to focus in on --
14    according to Detective Smith's report on March 13,
15    2017, is when you discovered this potential
16    discrepancy. Does that refresh your recollection?
17 A. It sounds correct.
18 Q. What time did you -- and you discovered a call
19    holding from the night before?
20 A. Yes.
21 Q. What was the call?
22 A. I don't remember the exact nature of the call.
23 Q. Was the call -- was the information about the call
24    saved?
25 A. I'm sorry, what's that?

1  Q. Was the information about the call saved?
2  A. I'm not sure what you mean by "saved."
3  Q. Well, what -- you said there was -- the report says
4     there was a dispatch in the queue, okay? Is the
5     information about what was in the queue was -- did
6     you retain that information at all?
7  A. I'm still not following your question.
8  Q. So there's a call for service that was pending in
9     the queue from the evening of March 12th.
10 A. Yes.
11 Q. Was the information about that call for service
12    preserved in any manner?
13 A. I think we have a copy of the CAD, yes.
14 Q. Did you give a copy of the CAD to Salem?
15 A. I don't recall.
16 Q. Okay. Now, what did you do as soon as you saw --
17    what did you do when you saw the call holding?
18 A. After I read the call I called dispatch.
19 Q. And what happened there? What did you find out when
20    you called dispatch?
21 A. I inquired as to why it wasn't handled and what time
22    Officer White had worked that day.
23 Q. And what did you do after calling dispatch?
24 A. I don't recall exactly.
25 Q. Okay. Then what did you do after you got off the

1                phone with dispatch?
2    A.   I went to the office.
3    Q.   And then what did you do?
4    A.   Began to sort through the information that they'd
5         sent me.
6    Q.   That who had sent you?
7    A.   Dispatch.
8    Q.   What information was that?
9    A.   Her times that she'd worked.
10   Q.   What days?
11   A.   I don't recall what days I asked for at that point.
12   Q.   So did you ever just ask Lacey why there was a
13        discrepancy in the March 12 time sheet?
14   A.   I did not.
15   Q.   Why?
16   A.   That's what I asked Salem to do.
17   Q.   But, I mean, why didn't you just call Lacey and find
18        out what had happened the night before and why there
19        was a discrepancy?
20             MR. CAMPBELL:  Objection; asked and answered.
21        You can answer it again.
22             THE WITNESS:  I was just going off the
23        information that I'd learned from dispatch.
24   BY MR. THENELL:
25   Q.   I understand that.  But you've got a two-person

1  department, you find there's a call holding, you
2  looked at the schedule, you looked at when she
3  logged off. Why didn't you call her and find out
4  what had happened the night before?
5     MR. CAMPBELL: Same objection. You can answer.
6     THE WITNESS: Again, I was just going off of
7  what dispatch had provided me.
8  BY MR. THENELL:
9  Q. You're not answering my question. Why didn't you
10  call Lacey that morning and find out why she went
11  home early?
12     MR. CAMPBELL: Object; argumentative.
13  Explained that's what he asked Salem police to do.
14  You can answer this question one more time.
15  BY MR. THENELL:
16  Q. I mean, that morning, I'm asking for your thought
17  process that morning why you didn't just pick the
18  phone up and ask Lacey what happened?
19  A. Again, just because I was going off of what dispatch
20  had provided me.
21  Q. For March 12th?
22  A. Originally for March 12th, and then for all of
23  March.
24  Q. So I'm only talking about March 12th. And I'm
25  focused on, you're not even at work yet, according

1  to your testimony. You find out -- you testified
2  that after you got information from METCOM, you went
3  to the office. So I'm basing it off of what you
4  just said to me, and I'm trying to understand
5  precise timeline of the morning of March 13th.
6      MR. CAMPBELL: Object to the form, misstates
7  testimony. He didn't say he wasn't at work yet.
8  BY MR. THENELL:
9  Q. So you saw a call holding, you called dispatch, you
10    looked at the schedule. At that point in time,
11    before you had any other information, before you
12    looked at the rest of March, why didn't you call
13    Lacey right then and ask her what had happened the
14    night before?
15     MR. CAMPBELL: Same objection. You can answer
16    it again.
17     THE WITNESS: I was going off of what
18    information I was getting from dispatch, and I was
19    on duty and it was early in the morning.
20 BY MR. THENELL:
21 Q. Did you ever think about calling Lacey and asking
22    her why she went home early?
23 A. I don't remember if I thought that or not.
24 Q. Okay. At what point during the day did you get the
25    rest of March?

1  A. Shortly after my phone call to dispatch.
2  Q. Okay. And then you looked at all of March, right?
3     Did you look at all of March?
4  A. The CAD sheets provided, yes.
5  Q. And did you compare those to the schedule?
6  A. No.
7  Q. Why not?
8  A. Because I didn't.
9  Q. Did you compare them to time sheets?
10 A. No.
11 Q. So alls you did was look at the CAD, right, for
12    March of '17, correct?
13 A. Correct.
14 Q. Then what did you do?
15 A. Called dispatch and requested February of '17.
16 Q. Okay. Then what did you do?
17 A. Looked at the information they provided for
18    February.
19 Q. Then what did you do?
20 A. Compared those to February time cards.
21 Q. At this time you did not have March -- the
22    March time sheet, did you?
23 A. Correct.
24 Q. Officers -- so Lacey would turn in one time sheet a
25    month at the end of the month, correct?

1  A. Correct.
2  Q. So you compared March -- or you compared the
3     February time sheets to the February CAD, correct?
4  A. Correct.
5  Q. Then what did you do?
6  A. I called dispatch and requested January.
7  Q. Then what did you do?
8  A. Went through the information that they sent me.
9  Q. All right. Then what did you do?
10 A. Compared those to January time card.
11 Q. And then what?
12 A. Requested -- called dispatch and requested all of
13    2016, all 12 months.
14 Q. Okay. Did you get that?
15 A. I did.
16 Q. This is all happening on March 13th?
17 A. Correct.
18 Q. Then what did you do?
19 A. Compared all those to time cards.
20 Q. Now, there were months where there were no
21    discrepancies, correct?
22 A. I don't recall.
23 Q. All right. How many days did you notice there were
24    discrepancies on?
25 A. I don't recall.

1  Q. What did you do after you compiled all of the CAD
2     reports and the time sheets?
3  A. Went to the city administrator.
4  Q. Okay. What did you and he talk about?
5  A. The issue at hand.
6  Q. And what did you do after that?
7  A. I don't recall.
8  Q. When did you talk to Chief Ferraris?
9  A. I don't recall the exact date.
10 Q. Was it the same day?
11 A. I don't remember.
12 Q. When did you call Chief Moore?
13 A. I don't remember off the top of my head.
14 Q. What was the date, if you recall, of the first leave
15    letter?
16 A. I'd have to look at it.
17 Q. Okay. Now, Mr. Smith's -- or Detective Smith's
18    report indicates that he was contacted by a Salem
19    lieutenant March 17 of '17. Did you contact Chief
20    Ferraris between the 13th and the 17th?
21 A. Again, I don't remember what the date was that I
22    spoke with Chief Ferraris.
23 Q. Well, you clearly contacted the City of Salem on or
24    before March 17, correct?
25 A. That sounds correct.

1  Q.  So did you talk to Chief Ferraris before you
2      contacted the City of Salem?
3  A.  Yes.
4  Q.  So sometime between the 13th and the 17th?
5  A.  Yes.
6  Q.  Was that a phone conversation or an e-mail
7      conversation?
8  A.  Phone.
9  Q.  Did you take notes of that conversation?
10 A.  No.
11 Q.  Prior to March 13th of 2017 had you ever compared
12     Lacey's time sheets to the MDT logs?
13 A.  No.
14 Q.  Prior to March 13, 2017 did Lacey ever come to you
15     regarding any departmental policy concerns she had?
16 A.  Can you ask that again?
17 Q.  Prior to March 13 of '17 did Lacey ever complain
18     about the department's failure to follow its own
19     policies?
20 A.  Yes.
21 Q.  Okay.  How many times?
22 A.  I don't know.
23 Q.  Prior to March 13 of '17 did Lacey ever complain to
24     you regarding physical security in terms of access
25     to the police department offices?

C E R T I F I C A T E

I, Colleen R. McCarty, Certified Shorthand Reporter, do hereby certify that DONALD TAYLOR appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn/affirmed, and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to typewriting; and, that the foregoing transcript, Pages 1 to 187, both inclusive, constitutes a full, true, and accurate record of said witness, and of all other oral proceedings had during the taking of said deposition, and of the whole thereof, to the best of my ability. I further certify review of the transcript was not requested.

Witness my hand at Portland, Oregon, this 15th day of March, 2019.

_____
Colleen R. McCarty, RPR
OR CSR No. 00-0371 Exp: 9/30/20
WA CCR No. 2044 Exp: 4/6/19